Lindsey Hutchison (OSB # 214690)
Willamette Riverkeeper
1210 Center St.
Oregon City, OR 97045
Tel: (503) 223-6418
Email: lindsey@willametteriverkeeper.org

Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, OR 97440
Tel: (541) 434-1463
Email: nick@cascwild.org

John Persell (OSB # 084400)
Oregon Wild
5825 N Greeley Ave.
Portland, OR 97217
Tel: (503) 896-6472
Email: jp@oregonwild.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **WILLAMETTE RIVERKEEPER,** an Oregon non-profit organization; **OREGON WILD,** an Oregon non-profit organization, and **CASCADIA WILDLANDS,** an Oregon non-profit organization, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | Case No.:  23-1631 |
| v. | (Environmental Matters – Violations of National Environmental Policy Act; Administrative Procedure Act) |
| **DENNIS C. TEITZEL**, in his official capacity as District Manager for the Northwest Oregon District of the Bureau of Land Management, and **UNITED STATES BUREAU OF LAND MANAGEMENT**, a federal agency, | |
| Defendants. | |

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| DNA | Determination of NEPA Adequacy |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ERMA | Extensive Recreation Management Area |
| FWS | Fish and Wildlife Service (US) |
| FLPMA | Federal Land Policy & Management Act |
| FONSI | Finding of No Significant Impact |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NSO | Northern Spotted Owl |
| Riverkeeper | All named Plaintiffs |
| SRMA | Special Recreation Management Area |
| RR | Riparian Reserve |
| Northwestern RMP | 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan |
| Programmatic FEIS | 2016 Proposed Resource Management Plan/Final Environmental Impact Statement for the Resource Management Plans for Western Oregon |
| RMP | Resource Management Plan |
| Big League Project | Big League HLB Landscape Plan |
| Southwestern RMP | 2016 Southwestern Oregon Record of Decision and Resource Management Plan |

## INTRODUCTION

1.      Plaintiffs Willamette Riverkeeper, Oregon Wild, and Cascadia Wildlands (collectively, "Plaintiffs" or "Riverkeeper") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of Dennis Teitzel, District Manager, and the Bureau of Land Management, Northwest Oregon District, Upper Willamette Field Office (collectively, "BLM" or "Defendants"). In issuing the Big League Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") for the Big League Project ("Project") in the Big League Project Area ("Project Area"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

Fig. 1: Map of the Big League Project Area



2.      The Big League DR/FONSI approves 12 years (2024–2036) of high-intensity, year-round

logging on approximately 4,600 acres of BLM lands within Lane and Linn Counties east of

Interstate 5 near the towns of Marcola and Holley.

3.      As seen in Figure 2 below, the broader Big League Project Area has been heavily logged.

The vast majority of the area is private industrial timberland, which is aggressively logged on

short rotations. The BLM has also been systematically converting its forests in the region into

plantations.

Fig. 2: Satellite image from Google Maps showing fragmented forest
surrounding Big League Project Area



4.      Through the Big League Project, the BLM is proposing to largely remove the last mature

forest habitat in the area—the few forest stands in the region left with large, old trees and

functioning wildlife habitat—through "regeneration harvest," colloquially known as

"clearcutting." The larger blocks of dark green in Figure 2 are more intact forest stands on BLM lands, many of which are now targeted for clearcutting.

5.      While our organizations generally prioritize more pristine areas for forest defense, the last mature forests in these critical watersheds are serving important and increasingly desperate ecological roles in protecting the remaining imperiled species and sheltering important waterways. The area proposed for logging contains several species of fish and wildlife protected under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, including northern spotted owls and Upper Willamette River spring Chinook salmon. Given the BLM's push in this region, these last remaining mature forest stands are unique and serve an ecologically vital role. These forests are also very close to local communities and public recreational opportunities.

6.      The BLM identified dozens of issues relevant to the Project and its environmental impacts, but it excluded nearly all of them from detailed analysis on the grounds that they did not relate to the Big League Project's narrowly defined purpose of timber production. Consequently, the agency gave no in-depth consideration to the Project's effects on, *inter alia*, protected fish and wildlife species and their habitat, invasive species infestations, water quality, low stream flows, fire hazard, or carbon sequestration and greenhouse gas emissions.

7.      Having predetermined that these issues merited no detailed consideration, the BLM failed to gather any relevant site-specific data or fully analyze and disclose the Project's potential site-specific impacts. Instead, the EA relied on a generalized 2016 analysis of all 2.5 million acres of BLM lands in western Oregon, which expressly contained no site- or project-specific detail.

8.      Overall, the BLM's analysis was incomplete and cursory and failed to provide a sufficient basis for the public and the decisionmaker to determine the significance of the Project's impacts as required by NEPA. Notwithstanding, the BLM refused to prepare a searching and careful

Environmental Impact Statement ("EIS") and otherwise failed to take the requisite "hard look" at the Project's impacts as required by NEPA.

9.      The BLM has specifically identified and begun to prepare at least three timber sales implementing the Big League Project, with at least nine more to come.

10.      This action seeks: a declaration that BLM violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations by a) failing to take a hard look at the Big League Project's site-specific impacts, b) failing to establish an environmental baseline, c) failing to consider cumulative impacts, and d) and failing to prepare an EIS. Accordingly, Plaintiffs specifically request the vacatur and remand of the Project EA, FONSI, and DR to the BLM.

11.      The requested relief is necessary to prevent unlawful agency action and forestall irreparable injury to Riverkeeper and the environment. If necessary, Riverkeeper intends to seek narrowly tailored injunctive relief during the pendency of this litigation.

12.      Should Riverkeeper prevail, Riverkeeper will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction under 28 U.S.C. § 1331 (Federal Question) and 1346 (United States as Defendant). Final agency action has occurred that is subject to judicial review pursuant to 5 U.S.C. §§ 704–706. An actual, justiciable controversy exists between Plaintiffs and Defendants. The Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14.      This cause of action arises under the laws of the United States, including the

Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* An actual, justiciable controversy exists between Plaintiffs and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

15.     Plaintiffs have exhausted their administrative remedies through timely participation in the BLM's planning process of the Big League Project. The release of the DR/FONSI constitutes a final agency action subject to review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

16.     Venue in this Court is proper under 28 U.S.C. § 1391 because all, or a substantial part, of the events or omissions giving rise to this litigation occurred within this judicial district. The BLM officials who authorized the decisions at issue maintain offices within this judicial district. The decisions at issue were developed and signed within this judicial district.

17.     This case is properly filed in the Eugene Division pursuant to Local Rule 3-2 because the Defendants' office where the DR/FONSI was signed and the Big League Project Area is located in Lane and Linn Counties. The events and omissions giving rise to this claim occurred and the public lands to which the DR/FONSI pertains are situated in the Eugene Division.

## **PARTIES**

18.     Plaintiff WILLAMETTE RIVERKEEPER is a 501(c)(3) non-profit organization headquartered in Oregon City with a satellite office in Eugene, Oregon, founded in 1996, with thousands of members in Oregon and the Pacific Northwest. Willamette Riverkeeper focuses on protecting and restoring the resources of the Willamette River Basin in Oregon and works on programs and projects ranging from the Clean Water Act compliance and river education to Superfund cleanup and restoring habitat.

19.     Plaintiff OREGON WILD is a nonprofit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon, and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and wildlife habitat across Oregon.

20.     Plaintiff CASCADIA WILDLANDS is a nonprofit corporation headquartered in Eugene, Oregon with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascade Bioregion.

21.     Plaintiffs and their members, supporters, and staff have concrete aesthetic, recreational, spiritual, scientific, and professional interests in the Big League Project Area.

22.     Plaintiffs' members, supporters, and staff regularly visit and enjoy the Big League Project Area—including the area in which the BLM is currently preparing a timber sale—and have concrete plans to do so in the future. Plaintiffs' members, supporters, and staff use the Project Area to recreate, enjoy nature, attempt to observe wildlife (including northern spotted owls and Chinook salmon), photograph wildlife and forest ecosystems, and otherwise enjoy the aesthetics and scientific bounty of the Big League Project Area.

23.     Plaintiffs' members, supporters, and staff intend to return to the Big League Project Area

in the near future to recreate and otherwise enjoy the Project Area. Plaintiffs' members, supporters, and staff are less likely to revisit the Project Area if the Big League Project is implemented as approved; when Plaintiffs' members, supporters, and staff do return, their ability to observe wildlife and intact forest ecosystems will be significantly and permanently impaired by the Project activities.

24.     Plaintiffs and their members, supporters, and staff would sustain concrete injury to their aesthetic, recreational, spiritual, scientific, and professional interests in the Big League Project Area if the BLM implements the Big League Project as authorized.

25.     Plaintiffs have organizational interests in the proper and lawful management of the Project Area. Plaintiffs and their members, supporters, and staff have actively participated in the Project's administrative processes. Plaintiffs and their members, supporters, and staff expend significant resources to track management activities on these lands, comment on agency proposals, work with BLM staff on the development of land-management plans, and field-check federal projects on these lands.

26.     During the comment periods, Plaintiffs submitted scientific literature that conflicts with the BLM's conclusions. The BLM did not substantially address this opposing evidence, as it would have been required to do in an EIS. Plaintiffs and their members, supporters, and staff are thus procedurally harmed by the BLM's failure to comply with federal law.

27.     Additionally, Plaintiffs' injuries are predicated on unlawful BLM actions that have diminished the trust between the BLM and the conservation community; facilitated the risk of unsupported and uninformed management and decision-making; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to Plaintiffs and their interests.

28.     Defendant DENNIS C. TEITZEL is the District Manager of the BLM Northwest Oregon District (Upper Willamette Field Office, specifically), where the Big League Project Area is located, and the responsible official for the Big League Project. He signed the decision approving the Big League Project.

29.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

30.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

31.     Upon review under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

### National Environmental Policy Act (NEPA)

32.     Congress enacted the National Environmental Policy Act to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and

stimulate the health and welfare of man; [and] to enrich the understanding of the ecological

systems and natural resources important to the Nation." 42 U.S.C. § 4321.

33.     To accomplish these purposes, NEPA and its implementing regulations set forth

procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental

consequences of their proposed actions, and (2) foster meaningful public participation.

34.     NEPA requires federal agencies to prepare, consider, publicly disclose, and approve a

"detailed statement" describing the environmental impacts of and alternatives to any major

federal action that may "significantly affect[] the quality of the human environment." 42 U.S.C.

§ 4332(2)(C). This detailed statement, known as an "Environmental Impact Statement," or

"EIS," must "provide full and fair discussion of significant environmental impacts and shall

inform decisionmakers and the public of the reasonable alternatives which would avoid or

minimize adverse impacts" *See* 40 C.F.R. §§ 1508.11, 1502.1. The agency must release its

analysis to the public before concluding its decision-making process or committing resources to

the project. 40 C.F.R. § 1500.1(b).

35.     If the agency is uncertain whether a proposed action may have a significant effect on the

human environment, the agency may prepare an Environmental Assessment, or "EA." 40 C.F.R.

§ 1501.4(b). An EA should be a concise public document that briefly describes the proposal,

examines reasonable alternatives, and considers the potential significance of environmental

impacts. 40 C.F.R. § 1508.9.

36.     Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect, and

cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1502.16, 1508.7.8. Direct

impacts are those that are caused by the action and occur at the same time and place. 40 C.F.R. §

1508.8(a). Indirect impacts are also caused by the action but occur later in time or are farther

removed in distance. 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts of the proposed

action, as well as impacts from other past, present, and reasonably foreseeable future actions,

both federal and non-federal. *Id*. § 1508.7. "Cumulative impacts can result from individually

minor but collectively significant actions." *Id*.

37.     In determining whether a proposed action may have a "significant" environmental effect,

an agency must consider its context and intensity. 40 C.F.R. §§ 1508.8, 1508.27. An action's

"intensity" depends on several factors, including impacts that may be both beneficial and

adverse; the unique characteristics of the relevant geographic area; the degree to which the

environmental effects are likely to be highly controversial; the degree to which the

environmental effects are highly uncertain or involve unique or unknown risks; whether the

action is related to other actions with individually insignificant but cumulatively significant

impacts; the degree to which the action may adversely affect an endangered or threatened species

or its critical habitat; and whether the action threatens to violate federal, state, or local law or

requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b).[1]

38.     NEPA places upon an agency the obligation to consider every significant aspect of the

environmental impact of a proposed action. To determine which aspects may require

---

[1] NEPA implementing regulations (before changes made by CEQ in 2020) enumerate ten
intensity factors an agency should consider when determining whether impacts are significant.
*See* 40 C.F.R § 1508.27(b) (1978). Regulations adopted by CEQ in 2020 direct agencies to
"analyze the potentially affected environment and degree of the effects of the action" to
determine significance. 40 C.F.R. § 1501.3(b) (2020). The regulations further explain that
"[s]ignificance varies with the setting of the proposed action," and that "in the case of a site-
specific action, significance would usually depend only upon the effects in the local area." *Id*. §
1501.3(b)(1). The new regulations now identify four considerations: (1) short and long-term
effects, (2) beneficial and adverse effects, (3) effects on public health and safety, and (4) effects
that would violate environmentally protective laws. *Id*. § 1501.3(b)(2).

analysis, an agency should look to the considerations and values expressed in the substantive statute driving or enabling the proposed action. If a particular resource value is addressed by the substantive statute, it is relevant to the analysis and must be duly considered by the agency.

39.     If the agency concludes that the action may have a significant impact, it must prepare an EIS. If the agency does not prepare an EIS, it must still undertake a thorough environmental analysis and supply a convincing statement of reasons explaining why the project's impacts will not be significant.

40.     The Council on Environmental Quality ("CEQ") regulations encourage agencies to "tier" their NEPA documents to eliminate repetitive discussions of the same issues. 40 C.F.R. § 1502.20. After a programmatic analysis is completed, a subsequent environmental review may incorporate the earlier analysis by reference and "concentrate on the issues specific to the subsequent action." *Id*.

41.     Courts view tiered analyses as a whole when determining whether they adequately address all impacts, and may reject the subsequent NEPA analysis if a significant issue is not fully considered in either document. An agency must conduct a site-specific analysis of the proposed action and its effects—a general overview of possible effects over a broad planning area is an insufficient level of detail at the project level.

42.     After conducting a full NEPA analysis of a project, the BLM may sometimes approve an implementing action pursuant to a Determination of NEPA Adequacy ("DNA"). DNAs are not themselves NEPA documents. As described in the BLM's NEPA Handbook, DNAs may be used to confirm that an action is adequately analyzed in an existing NEPA document and conforms to the approved land use plan. DNAs do not contain the environmental analysis required by NEPA.

43.     The BLM has stated that there are four appropriate uses for DNAs: (1) when there is a

new proposed action that is similar to a previous action that was already fully analyzed in a

NEPA document, (2) when there is a new proposed action that is part of a broader action that was

already fully analyzed in a NEPA document, (3) when the original NEPA analysis is old and the

agency needs to determine whether new analysis is needed due to new information or changed

circumstances, and (4) when there is new information not considered in existing NEPA analysis

and the agency needs to determine whether that new information warrants new analysis.

44.     A DNA cannot compensate for an earlier, inadequate NEPA document.

**Endangered Species Act (ESA)**

45.     The Endangered Species Act ("ESA"), enacted in 1973, is meant to provide a means to

conserve the ecosystems upon which endangered and threatened species depend and to provide a

program to conserve listed species. 16 U.S.C. § 1531(b).

46.     The ESA requires each federal agency, in consultation with a federal wildlife agency,

such as the National Marine Fisheries Service ("NMFS") or U.S. Fish and Wildlife Service

("FWS"), to ensure that any proposed action is not likely to jeopardize the continued existence of

a threatened or endangered species or result in the destruction or adverse modification of its

critical habitat. 16 U.S.C. § 1536(a)(2). To make this determination, the agencies must "use the

best scientific and commercial data available" to fulfill their obligations. *Id*.

47.     Formal consultation is required if an action agency determines a proposed action is likely

to adversely affect a listed species or designated critical habitat. 50 C.F.R. § 402.14(a) & (b)(1).

48.     In order to determine whether an action is likely to adversely affect a listed species or

critical habitat, an action agency must prepare a biological assessment. 16 U.S.C. § 1536(c); 50

C.F.R. § 402.12(a).

49.     A biological assessment must "evaluate the potential effects of the action" (direct,

indirect, and cumulative—additive to the environmental baseline). 50 C.F.R. § 402.12(a); *Id.* § 402.12(f)(4).

50.     At the conclusion of formal consultation, NMFS must issue a "biological opinion" explaining whether the proposed action is likely to result in jeopardy to the listed species or destruction or adverse modification of critical habitat. *Id.* § 402.14(g)(5) & (h); 16 U.S.C. § 1536(b)(3)(A).

51.     After the consultation has concluded, but when "discretionary Federal involvement or control over the action has been retained or is authorized by law," both NMFS and the action agency must reinitiate consultation under certain circumstances. 50 C.F.R. § 402.16(a).

52.     The agencies must reinitiate consultation when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or when "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence." *Id.* § 402.16(a)(2) & (3).

53.     The duty to reinitiate consultation lies with both the action agency and the consulting agency. Consultation alone does not satisfy the agency's duty because an agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species. *Id.* § 402.16(a)(2) & (3).

54.     When a party points to new information, *i.e.*, information the consulting agency did not take into account at the time of the biological opinion that challenges the opinion's conclusions, reinitiation is proper because an action agency may not rely on that faulty biological opinion to satisfy its ESA obligations.

**Federal Land Planning and Management Act (FLPMA)**

55.     Congress enacted the Federal Land Policy and Management Act ("FLPMA") to ensure that our public lands are "managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(a)(8). It directs the BLM to develop a land use planning process for present and future uses of public lands. 43 U.S.C. § 1701(a)(2).

56.     To achieve these goals, FLPMA requires the BLM to develop resource management plans ("RMPs") that govern the use of BLM-administered land. 43 U.S.C. § 1712. An RMP defines the values for which the BLM must manage the land to which it applies and contains substantive standards by which it must do so.

57.     Once the plan has been adopted, the BLM must manage its lands in compliance with, and ensure that any site-specific projects conform to, the applicable RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). Pursuant to FLPMA and its implementing regulations (43 U.S.C. § 1732(a) 43 C.F.R. § 1610.5-3(a)), the BLM must ensure that a site-specific project conforms to the RMP and requires that all BLM lands be managed for multiple uses and to protect a wide range of natural resource values. *See*, *e.g.*, 43 U.S.C. § 1701; *see generally id*. §§ 1701–1782.

58.     An RMP does not change the BLM's responsibility to comply with applicable laws and regulations, nor does it establish or alter national BLM policy. An RMP does not analyze or authorize any specific projects. An RMP is a preliminary step in the overall process of managing public lands and is intended to guide and control future management actions and the development of subsequent, more detailed and limited-scope plans for resource management.

59.     The Big League Project was developed under the 2016 Northwestern and Coastal Oregon Record of Decision and Resource Management Plan.

**Oregon and California Revested Lands Act of 1937 (O&C Act)**

60.     Enacted in 1937, the O&C Act provides that certain revested railroad lands in western

Oregon "classified as timberlands . . . shall be managed . . . for permanent forest production, and

the timber thereon shall be sold, cut, and removed in conformity with the [principle] of sustained

yield for the purpose of providing a permanent source of timber supply, protecting watersheds,

regulating stream flow, and contributing to the economic stability of local communities and

industries, and providing recreational facilities." 43 U.S.C. § 2601.

## FACTUAL BACKGROUND

**The 2016 Northwestern and Coastal Oregon Resource Management Plan**

61.     The 2016 Northwestern and Coastal Oregon Record of Decision and Resource

Management Plan ("Northwestern RMP") provides overall direction for the management of all

resources on approximately 1.3 million acres of BLM-administered lands, including lands within

the Upper Willamette Field Office and the Project Area.

62.     The BLM adopted the Northwestern RMP after preparing a Final Environmental Impact

Statement ("programmatic FEIS") which analyzed both the Northwestern RMP and the

Southwestern Oregon Record of Decision and Resource Management Plan ("Southwestern

RMP"), which covers an additional 1.2 million acres of BLM-administered lands in southern

Oregon. The programmatic FEIS thus broadly described and analyzed a total of 2.5 million acres

across Oregon. Vegetation, hydrology, geology, wildlife populations, fire history, proximity to

human development, and past resource use vary widely across this enormous planning area.

63.     The management objectives of the Northwestern RMP include, in relevant part, providing

a sustained yield of timber; enhancing the health and stability of forest stands; preventing the

introduction of invasive species; contributing to the conservation and recovery of threatened and

endangered species; providing clean water in watersheds; and restoring fire-adapted ecosystems. These objectives guide the management decisions for all BLM lands in northwestern Oregon.

64.     To achieve these objectives, the Northwestern RMP imposes substantive standards and guidelines for managing a broad range of resource values.

65.     The Northwestern RMP divides BLM-administered land between five specific land use allocations: Congressionally Reserved Lands and National Conservation Lands, District-Designated Reserves, Late-Successional Reserves, Riparian Reserves, and Harvest Land Base. Each allocation has different management objectives and directions that identify which future actions may or may not be allowed within a particular area.

66.     The Big League Project Area primarily consists of lands categorized as Harvest Land Base ("HLB"), though some of the Project units also contain and intersect Riparian Reserves and Late-Successional Reserves ("LSRs").

67.     Management directives specific to the HLB include conducting silvicultural treatments to enhance timber values and reduce fire risk; restore and maintain habitat for sensitive species; provide complex early-seral ecosystems; promote the development of structural complexity; meet snag retention and creation levels; and retaining large trees.

68.     The BLM is required to demonstrate how any project developed under the Northwestern RMP will follow relevant management directions to achieve the RMP's objectives. This includes site-specific analyses of landscape characteristics—including wildlife populations, snags, stand density and conditions, tree diameter and age, invasive species infestations, extent of detrimental soil disturbance, water quality, and availability of wildlife habitat—to ensure compliance with the RMP's substantive standards and guidelines.

**The Big League Project**

69.    The Big League Project proposes to log approximately 4,600 acres over the next 12 years (2024–2036).

70.    In the Draft Big League EA, the BLM stated that the Big League Project's purpose and need was to commercially harvest timber to contribute timber volume to the Allowable Sale Quantity. It stated that the Project would conform to the Northwestern RMP.

71.    The Draft EA noted that comments from BLM personnel and the public had identified a number of environmental issues that would be affected by the proposed logging, but the agency had chosen not to analyze most of them in detail. Many of the issues that the BLM did not analyze have corresponding mandatory standards and guidelines within the RMP.

72.    Riverkeeper timely submitted comments on both the scoping notice and the draft EA. Riverkeeper specifically raised a number of issues, noting, *inter alia*, that the proposed Big League Project would have significant impacts on wildlife habitat, invasive species, water quality, flows, wildfire hazard, sensitive plant species, wildlife, and recreation; that the BLM had arbitrarily excluded these issues from detailed analysis; that the EA did not contain adequate site-specific information; that the EA did not contain adequate analysis of cumulative impacts; and that the BLM should therefore prepare an EIS to fully analyze and disclose the Project's potential impacts.

73.    The BLM issued the Final EA for the Big League Project on July 19, 2023, as well as a FONSI on July 24, 2023.

74.    The Final EA considered just six issues:

    1.    How much timber volume would be obtained and how would this volume contribute to the achievement of the declared annual allowable sale quantity for the Eugene sustained yield unit?

2.      How would road construction and ground-based yarding affect detrimental soil disturbance, including soil compaction?

3.      How would timber harvest and reforestation affect stand level fire hazard and resistance?

4.      How would timber harvest activities affect fire risk within Wildland Developed Areas?

5.      How would timber harvest activities, such as road building, use, maintenance, and decommissioning affect the amount of sediment entering streams in the Big League Project area?

6.      How would timber harvest and road construction affect visual resources?

75.    The EA identified another 25 issues that the agency excluded from detailed analysis, including, *inter alia*, the project's impacts on carbon sequestration, greenhouse gas emissions, and climate change; protected wildlife such as northern spotted owls, Upper Willamette River spring Chinook salmon, and Bureau Sensitive Species; botany; invasive species; forest structure and species diversity; fisheries; water quality, temperature, and availability; and recreation. Functionally, all environmental consequences were excluded from detailed analysis. The remaining issues for the BLM to consider were just timber production (how much and how fast), soil, fire, and Project infrastructure logistics.

76.    The EA stated that excluded issues were not analyzed in detail because they were not related to the Project's purpose and need, and no analysis of the excluded issues was necessary to determine the significance of the Project's impacts.

77.    The issues excluded from detailed analysis were not merely Riverkeeper's forest-friendly value wish list, but rather codified federal resource management priorities, standards, and guidelines adopted in the Northwestern RMP—the law governing forest management on public lands administered by the BLM in Oregon (FLPMA).

78.    In Appendix A to the EA, the BLM briefly discussed the issues not presented in detailed analysis. In each case, the agency presented excuses for not analyzing the relevant issue, and summarily concluded that there would be no significant effects, either individually or

cumulatively, beyond those described in Northwestern RMP and the programmatic FEIS to which the Big League Project EA purportedly tiered.

79.    The BLM declined to fully analyze issues related to the ESA-listed northern spotted owl and Upper Willamette River spring Chinook, stating that the programmatic FEIS contained a sufficiently detailed analysis of those matters and that the Project would have no significant effects beyond those identified in the RMP FEIS.

80.    Neither the programmatic FEIS, the Big League Project EA, nor the programmatic biological opinions analyzed the Big League Project's specific impacts on ESA-listed species.

81.    Three DNAs were released contemporaneously with the FONSI on July 24, 2023. This means the BLM had extensive site-specific information related to at least these timber sales when it published its empty EA days earlier. All three DNAs omitted consideration of the relevant environmental issues discussed above.

82.    The Big League Project targets the few remaining islands of older forest within an area that has been largely clearcut logged. These logged areas are either private industrial timber holdings or other recent BLM logging projects.

83.    By approving the Big League Project, the BLM will remove the last few possible holdings for the owls and degrade the remaining percentage of salmon habitat within the Calapooia watershed. This is a potential nail in the coffin for both these species in this area.

84.    In addition to impacts to these protected species, the Project will lead to pervasive invasive species infestations, result in a steep increase in wildfire hazard for local communities, degrade recreation areas and opportunities, diminish carbon sequestration potential and greenhouse gas emissions reduction efforts, and impair water quality and quantity throughout the

Project Area and downstream. This includes negative impacts to domestic and community water supplies.

85.     The project area is also adjacent to large wildfires that occurred over the past few years; these fires were followed by widespread post-fire clearcutting.

86.     For example, the 2020 Holiday Farm Fire burned approximately 173,393 acres, mainly within the McKenzie River Watershed. The fire burned some of the Calapooia Watershed as well, including the Jackson Creek-Wiley Creek, Bigs Creek-Calapooia, and Hands Creek-Calapooia subwatersheds, all of which contain designated critical habitat for Upper Willamette River Chinook salmon. Approximately 13,724 acres burned within these subwatersheds. The burned area nearest to the Big League Project Area is within the Bigs Creek-Calapooia Watershed, approximately 2.6 miles away.

87.     Fires in the area occurred again in subsequent years, including as recently as August and September of this year (*e.g.*, Lookout Fire near Blue River, Oregon).

88.     Fires affect forest ecosystems in various ways and can deeply change and alter the habitat distribution of wildlife species and result in significant changes to baseline conditions for countless resource values.

89.     For example, fire affects fish habitat by increasing sediment production and turbidity, decreasing stream cover, increasing stream temperature, and reducing root structure from trees, shrubs, grasses, brush, etc., which affects seasonal stream flows.

90.     As part of the Big League NEPA process, the BLM made no attempt to assess changes and impacts to the area as a result of substantial wildfires despite fourfold increases in anticipated burned acreage within the area analyzed by the RMP.

**Chinook Salmon and the Big League Project**

91.     The watersheds within the Project area, notably the Calapooia River, provide habitat for Upper Willamette River spring Chinook salmon (*Oncorhynchus tshawytscha*). Chinook salmon are a federally listed threatened species in Oregon pursuant to the Endangered Species Act.

92.     The Upper Willamette River spring Chinook salmon is an anadromous salmonid native to the Willamette River above Willamette Falls.  As an anadromous fish, these Chinook salmon are born in freshwater streams in the Upper Willamette River Basin and migrate down the Willamette River and Columbia River to the ocean, where they live for several years before returning to their natal streams to spawn and complete their life cycle.

93.     Upper Willamette River spring Chinook salmon are considered one of the most genetically distinct groups of Chinook salmon in the Columbia River Basin. Historically, the Upper Willamette River supported hundreds of thousands of spring Chinook salmon, but populations have declined dramatically (counts averaged less than 10,000 fish at Willamette Falls since 2010).

94.     Upper Willamette spring Chinook adapted to the natural flows in the Willamette River by returning from the ocean and entering the river in late winter to ascend Willamette Falls, which historically acted as an intermittent physical barrier to upstream migration into the Upper Willamette Basin. Adult spring Chinook salmon could only ascend the falls in the spring when flows were high enough to support their passage over the falls.

95.     After ascending the falls, adult Chinook migrate quickly to upper subbasins and hold in deep pools with cool water temperatures through the summer. The historic spawning period for spring Chinook likely extended from July through October, but now spawning generally begins in late August and continues into early October, with peak spawning in September.

96.     In 1999, the National Marine Fisheries Service listed the Upper Willamette River spring Chinook salmon as threatened under the ESA. In 2005, NMFS designated critical habitat in the Upper Willamette River Basin and determined this species was "likely to become endangered in the foreseeable future." In 2011, NMFS updated this opinion and found that five of the seven distinct Upper Willamette River spring Chinook salmon populations were at "very high risk" of extinction, including the Calapooia population.

97.     The Upper Willamette River "primary constituent elements" for spring Chinook salmon—the physical and biological features essential to their conservation—include water quality and quantity, spawning gravels and substrate, forage, natural cover including side channels and large wood, unobstructed migration corridors, and floodplain connectivity. Each of these elements and habitat features are negatively affected by logging and road-building activities, especially those in close proximity to riparian areas.

98.     Logging activities have resulted in changes in flows, sediment load, and stream temperature which has caused significant negative issues for this migratory salmonid.

99.     Per the Recovery Actions relevant to Upper Willamette spring Chinook, federal agencies are to, *inter alia*, incorporate water availability analysis in land use planning activities to ensure efficient use of water, improve tributary flows, and reduce stream temperatures; and to protect and restore riparian areas in tributaries to provide shade and future wood sources.

100.     Additionally, the RMP requires the BLM to "Manage habitat for species that are ESA-listed, or are candidates for listing, consistent with recovery plans, conservation agreements, and designated critical habitat." It also requires the BLM to "Implement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and

projects. Conservation measures include altering the type, timing, location, and intensity of management actions."

101.    The Big League Project logging units are adjacent to (within one site-potential tree height) the Calapooia River and its Critical Habitat for Upper Willamette spring Chinook salmon. While the Big League Project does not explicitly target Riparian Reserves ("RR") for logging, the Project does involve extensive road construction and yarding corridor placement in the riparian reserves.

102.    Yarding corridors would affect up to 12.4 acres within RR, and new road construction would affect up to 27.3 acres of RR. The total disturbance from these activities would be up to 39.7 acres. The Project will include 125 yarding corridors located in RR. 45 of these will directly cross fish-bearing streams. Yarding corridors are areas of complete tree removal to facilitate the logging of adjacent areas. An unspecified amount of new stream crossings would occur.

103.    Even if the amount of forest removal in the RR or near streams is low in relation to the overall size of the Big League Project, the amount of logging and road construction proposed will have significant local effects and potentially significant watershed-level effects due to the overall very small amount of functioning Chinook habitat left.

104.    The majority of the forest land along the Calapooia and its tributaries have been converted from old growth forest to plantations and agricultural lands, which has depressed fish populations in the watershed.

105.    Within the Mohawk Headwaters, Seeley Creek, Drury Creek, and Log Creek, large woody debris (LWD, an essential salmon habitat feature) was found to be "practically non-existent with basin average at 0.7 pieces per mile," and "juvenile rearing habitat, in the form of

side channel, backwater, slough, or alcove pools was available in only 2.6 percent of 500+

habitats inventoried for the basin," per prior studies cited by the BLM.

106.    The watersheds within the Project Area are also designated and maintained as "Essential

Salmonid Habitat" ("ESH") by the State of Oregon.[2] The State designates ESH to "protect the

streams where salmonid species lay eggs and where young fish grow before traveling to the

ocean. Chum, sockeye, Chinook, and coho salmon, as well as steelhead and coastal cutthroat

trout are all sensitive, threatened, or endangered salmonid species whose habitat may be

designated as essential.[3]

107.    Despite the presence of imperiled Chinook habitat and admitted impacts to that habitat,

the BLM did not pursue site-specific analysis of environmental factors and Project impacts that

may affect this habitat, including impacts on sedimentation.

108.    The Big League Project instead tiered to its sedimentation NEPA analysis associated with

the Marcola Sunrise Project to conclude that its proposed logging and roadbuilding would have a

similar positive effect on sedimentation in the streams to be impacted.

109.    The Marcola Sunrise Project proposed up to 2,700 acres of Harvest Land Base

regeneration harvest, but it also included a very large amount of road renovation, including

extensive culvert replacement, storm-proofing, and regrading and resurfacing of 170 miles of

roads. All of this renovation work would be completed within 5 years.

110.    While the Marcola Sunrise Project did include the construction of up to 22 miles of new

---

[2] https://maps.dsl.state.or.us/esh/ (*see*, *e.g.*, Mohawk, Calapooia).
[3] *See* ORS 196.810, OAR 141-102; *see also*
https://www.oregonlegislature.gov/committees/hagnr/WorkgroupDocuments/Eric%20Metz,%20
DSL%20(fact%20sheet%20-%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%20meeting).pdf.

roads, it considered the complete decommissioning of all new road construction so that these areas would not continue to contribute sediment to the water system over time. The Marcola Sunrise Project sedimentation analysis concluded that the sedimentation associated with this new road construction and log hauling associated with the proposed logging would roughly balance with the positive sedimentation impacts of the 170 miles of road renovation.

111.    The Big League Project is not similarly focused on road renovation. The Big League Project would renovate or improve 46 miles of existing road. This is less than a third of the road renovation work analyzed in the Marcola Sunrise Project. The Big League Project will construct 32 miles of new roads. The Big League Project includes extensive yarding across streams in riparian areas, which was not analyzed in the Marcola Sunrise EA.

112.    Tiering allows the agency to incorporate by reference analysis that has already been completed to prevent duplicative and redundant analysis of environmental impacts.

113.    The Marcola Sunrise Project EA did not analyze the Big League Project's impacts on sediment, the two projects are not within the same type of land use designations, and the two projects do not purport to utilize the same harvest prescriptions, yarding, and hauling practices. Nor do the two projects involve the implementation of the same mitigation measures or the same likelihood of improved conditions ("some," according to the Big League EA, versus balanced decommissioning modeled to result in a 9 percent decrease in sediment load across 170 acres of haul routes, according to the Marcola Sunrise EA).

114.    The BLM failed to take a hard look at sedimentation effects in the Big League EA, and the Big League Project stands to undermine both State and Federal recovery efforts of the uniquely adapted and amazing Upper Willamette River spring Chinook salmon.

**Low Flows and the Big League Project**

115.    Heavy logging within forested watersheds affects flows (peak and summer).

116.    Clearcut forest ecosystems allow water to run quickly through them with little structure to slow entrance into waterways, often resulting in higher peak flows and lower late summer flows, both of which can negatively impact aquatic species.

117.    After replanting, new plantations take decades to again provide the ecosystem benefits and flow-regulating characteristics of a more mature and healthy forest. In summer, these young establishing plantations have higher daily transpiration rates relative to mature or older conifers, meaning they absorb more water, thereby reducing summer stream flows.

118.    Thus, recent studies have revealed that the conversion of mature and old-growth conifer forests to plantations of native Douglas-fir produced persistent summer stream flow deficits. This result challenges the widespread assumption of rapid "hydrologic recovery" following forest disturbance. Widespread transformation of mature and old-growth forests into plantations likely contributes to summer water yield declines over larger basins.

119.    Plaintiffs raised this issue and cited reputable literature addressing this very point, including the Perry Jones study titled, "Summer streamflow deficits from regenerating Douglas-fir forest in the Pacific Northwest, USA." The BLM did not address this study because it claimed the study was not relevant because the BLM was not logging old growth. The BLM's reason for dismissal misinterprets the study. The study found the widespread conversion of mature forests into plantations caused low summer flows.

120.    Reduced summer streamflow has potentially significant effects on aquatic ecosystems. Summer streamflow deficits in headwater basins may be particularly detrimental to anadromous fish, including steelhead and salmon, by limiting habitat, exacerbating stream temperature

warming, and potentially causing large-scale die-offs (Hicks *et al.*, 1991; Arismendi, Johnson, Dunham, Haggerty, & Hockman-Wert, 2012; Arismendi, Safeeq, Johnson, Dunham, & Haggerty, 2013; Isaak, Wollrab, Horan, & Chandler, 2012).

121.    In the nearby Marcola Sunrise Project, the BLM did analyze the potential for low summer flows. There, the BLM found that because 60% of BLM lands in the watershed were in reserve allocations, and because the watersheds proposed for treatment have a broad range of stand age and hydrologic conditions, low summer flow response would attenuate downstream.

122.    Although as the BLM claims, the Marcola Sunrise Project and the Big League Project are similar in some respects, the Big League Project targets watersheds that are in a far worse condition and have far fewer amounts of acreage in reserve allocations than the Marcola Sunrise Project. The BLM is attempting to brush aside this issue because it will likely have significant implications for the resident Chinook population.

123.    The BLM did not engage with the above-referenced literature that was submitted to the BLM during the administrative comment period, and otherwise failed to consider how forest practices impacting flow may adversely affect aquatic species.

124.    Like other resource issues dismissed from the BLM's consideration, this is not just a random area of ecological focus important to Plaintiffs; rather, these are federal forest management priorities relevant to actions within forested ecosystems.

125.    Specifically, the RMP outlines that stream flows should be maintained, and the Recovery Plan for Upper Willamette River spring Chinook salmon flags streamflow as an important issue to monitor in recovering that species. The O&C Act also requires that BLM-authorized timber harvest protect watersheds and regulate stream flow.

**Northern Spotted Owls and the Big League Project**

126.    The northern spotted owl (*Strix occidentalis caurina*) ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the Big League Project Area.

127.    Spotted owls rely on older, mature, and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal.

128.    Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the U.S. Fish and Wildlife Service ("FWS") listed the NSO as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

129.    The FWS designated critical habitat for the species in 1992, and revised the designations in 2008, 2012, and 2021.

130.    The 2012 critical habitat rule states that "primary constituent elements" of NSO critical nesting and roosting habitat typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (*e.g.*, large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly. 77 Fed. Reg. 71,806, 71,905 (Dec. 4, 2012).

131.    The BLM Northwest Oregon District and the Big League Project Area are within the range of the northern spotted owl.

132.    The Big League Project's logging and road construction is "likely to adversely affect" spotted owl habitat and spotted owl nest sites. The Project's logging units fall within nine known or potential spotted owl sites; these sites are all already heavily degraded and have less than 50 percent suitable habitat in the core areas around nests, and all but one owl site has less than 40 percent suitable habitat remaining in the larger home range areas surrounding the nest sites. This means that any further habitat removal is highly likely to jeopardize these sites. Further, 11 percent of the proposed logging will occur within spotted owl sites that have been documented as occupied within the past ten years.

## CLAIM FOR RELIEF
### (Violations of the National Environmental Policy Act)

### Count 1: Failure to Take a Hard Look at Site-Specific Impacts and Improper Tiering

133.    Riverkeeper realleges and incorporates by reference all preceding paragraphs.

134.    Federal agencies are required to disclose and analyze the direct, indirect, and cumulative effects of proposed actions on the environment. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c), 1508.27(b)(7). The impacts analysis in an EA must be "site-specific" because in order to determine the "significance" of an action, the agency must take a hard look at impacts on the affected region, the affected interests, and the locality. 40 C.F.R. § 1508.27(a).

135.    In other words, an EA must provide sufficient evidence and analysis, including disclosure and consideration of the environmental impacts of a proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

136.    To take the required "hard look" at a project's effects, an agency may not rely on

incorrect assumptions or data. The information must be of high quality. Accurate scientific analyses, expert agency comments, and public scrutiny are essential to implementing NEPA.

137.    An agency's substantive statutory responsibilities inform the issues that must be considered in a NEPA analysis. Thus here, the pertinent standards in the RMP as dictated by FLPMA inform the issues that must be considered by the BLM in the NEPA process.

138.    The Big League EA does not contain an analysis of numerous relevant environmental issues, including but not limited to impacts to ESA-listed species and their habitat, Bureau Sensitive Species, water quality, sedimentation, low flows, invasive species, fire hazard, and carbon sequestration. All of these issues have corresponding standards and guidelines within the RMP.

139.    The BLM conclusively declared that impacts to these issues were not significant and were not worthy of consideration because they were already analyzed in the BLM's 2016 RMP NEPA analysis or were not related to the BLM's selected purpose and need of timber volume generation. This is improper and illegal.

140.    NEPA allows agencies to tier their analyses to a previous NEPA document (generally, a programmatic assessment) in order to eliminate repetitive discussions and concentrate on the issues specific to the proposed action, 40 C.F.R. § 1508.20, 1508.28. Tiering refers to coverage of "general matters" in the programmatic NEPA document with a subsequent narrower NEPA document incorporating by reference the "general discussions." 40 C.F.R. § 1508.28. The agency must still conduct a site-specific and project-specific analysis in any subsequent NEPA document. *Id.*

141.    The BLM improperly tiered the Big League EA to the Northwestern RMP and

programmatic FEIS and other NEPA documents. While this is appropriate for generalized analyses and background discussion of the issues, the BLM is instead attempting to substitute required site-specific analysis with references to other documents that do not conduct a relevant analysis of the Big League Project's effects.

142.     For some environmental issues, the BLM stated that site-specific analysis will occur when implementing sales by DNAs. The problem with this approach is that the decision to log these areas will have already occurred, without consideration and disclosure of total effects, public scrutiny of the BLM's portrayal of these effects, or a reasoned determination that it will comply with the Northwestern RMP and FLPMA.

143.     Given the size of the Big League Project Area and the timing of its release, it was feasible for the BLM to analyze and disclose the site-specific information when reaching its decision. The BLM had site-specific information pertaining to at least three individual timber sales when it published the Big League EA, but omitted this information from that EA.

144.     The result of the BLM's chosen approach is that numerous environmental values identified in the 2016 RMP and charged to the BLM to protect, weigh, measure, and balance are simply never considered or accounted for by the agency or are considered or accounted for too late to influence an already-made decision or ensure the agency has acted in compliance with the RMP, vis-à-vis FLPMA.

145.     The BLM's failure to take the requisite hard look at the Project's site-specific impacts precluded it from assessing the Project's direct, indirect, and cumulative effects, and resulted in a failure to make a reasoned determination of non-significance. Improper tiering to other NEPA analyses that never considered the Big League Project's impacts also violates NEPA and its

implementing regulations and is arbitrary, capricious, and an abuse of discretion, not in

accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2: Failure to Establish an Environmental Baseline**

146.    Riverkeeper realleges and incorporates by reference all preceding paragraphs.

147.    Federal agencies are required to "describe the environment of the area to be affected or

created by the alternatives under consideration." 40 C.F.R. § 1502.15. "[B]aseline conditions"

must be set forth before any project implementation occurs, otherwise, the agency cannot

determine what effect the project will have and, therefore, cannot comply with NEPA or ensure

that the proposed action will comply with applicable substantive standards.

148.    The BLM failed to establish an accurate environmental baseline for various resource

values, in violation of NEPA. Because the BLM failed to collect and study baseline conditions in

the planning area, it has no way of rationally determining what the impacts of the Project will be

or whether it can manage them in compliance with the Northwestern RMP. The BLM also cannot

adequately monitor and document the effects of Project activities because it will have no

accurate baseline to measure the impacts against.

149.    The lack of baseline data generally reflects the absence of any site-specific data for the

vast majority of relevant environmental issues associated with the Big League Project.

150.    The BLM did not establish baseline levels of sedimentation or invasive weed infestation,

did not identify where the spotted owl sites were located, did not identify where unique habitats

or sensitive species were located, did not identify where domestic water sources were located,

and did not assess forest conditions across the different watersheds, which can impact low

summer stream flows and existing levels of stream flow.

151.    Recent wildfires also affected the environmental baseline for several resource values in

the Project Area, including listed fish habitat and habitat for the northern spotted owl, among other significant resource values.

152.    The BLM acknowledges that these fires likely degraded Chinook salmon habitat and the amount and availability of northern spotted owl habitat but did not make any effort to quantify or incorporate these impacts. The BLM also does not even mention the widespread post-fire clearcutting of private industrial timberland that has occurred throughout the project area since 2020. The failure to incorporate or quantify this new information means the agency has no accurate baseline to support its findings.

153.    The BLM's failure to provide accurate and complete data on baseline conditions violates NEPA and its implementing regulations and is arbitrary, capricious, and an abuse of discretion, not in accordance with and without observance of procedure required by law. U.S.C. § 706(2).

**Count 3: Failure to Take a Hard Look at Cumulative Impacts**

154.    Riverkeeper realleges and incorporates by reference all preceding paragraphs.

155.    NEPA and its implementing regulations require federal agencies to take a hard look at the cumulative environmental impacts of proposed actions. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1508.7, 1508.25(a)(2). When analyzing cumulative effects, an agency must analyze the effects on the environment resulting from the incremental impacts of the action when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.§ 1508.7.

156.    The Big League Project will have cumulative impacts that the BLM did not analyze in the EA, FONSI, and DR. The Big League Project will have cumulative impacts with other recent and ongoing BLM timber sales, including the Shotcash Timber Sale, Row River Timber Management Project, Marcola Sunrise Timber Management Project, King Mosby Timber Management Project, and the Siuslaw HLB Landscape Plan. The Big League Project EA will

also have cumulative impacts with adjacent private lands logging, which is recent, widespread, and intensive.

157.    The BLM performed no cumulative impact analysis for nearly all of the issues identified in the EA. Even for the issues for which the BLM purported to conduct a cumulative impacts analysis, there is no quantification from past projects or those that will occur concurrently. The BLM did not take a hard look at the cumulative impacts associated with this Project.

158.    This is consequential because widespread clearcutting throughout the Project Area will have cumulative impacts on ESA-listed wildlife species and their habitat, water quality, stream flow levels, invasive species spread, and wildfire hazard and risk, among other environmental values, resulting from the Project.

159.    The heavy toll that past logging has taken on the broader area surrounding the Project has led to numerous significant environmental problems that the BLM lacks adequate resources to control or mitigate. The Big League Project will compound these issues, but none of this is fully acknowledged or analyzed in the NEPA documents.

160.    For example, sediment runoff from unmaintained roads is a persistent problem affecting fish passage and habitat for aquatic species in the watersheds within the Project Area, including the listed Upper Willamette River spring Chinook salmon.

161.    Here, through the Big League Project, the BLM will compound this issue with the addition of over 46 miles of new road construction, approximately five miles of which is directly in riparian areas. The BLM claims it will mitigate the impacts of this new road construction, but concurrently admits it lacks adequate resources to address these persistent problems within its sprawling road inventory.

162.    More generally, the BLM failed to consider the cumulative effect of this Project

contextually. This Project occurs in a checkerboard of heavily logged private lands. The additive effect of Federal management to mirror the practices on adjacent private lands must be accounted for in the BLM's analysis.

163.    It is unlikely that any habitat or functioning ecosystem remains on the adjacent private lands. This is especially important for issues related to aquatic impacts, including potential impacts on summer stream flows. Lower stream flows that could result from the project can compromise community water sources, fish habitat, and swimming and other recreation.

164.    The agency failed to consider the reality that today's proposed matching Federal clearcuts will highly likely result in no remaining functioning habitat, with all lands equally contributing too much sediment, too much carbon, and too little ecological benefit to support the rivers, species, and downstream communities.

165.    The BLM's failure to take the requisite hard look at the cumulative effects of the Big League Project when added to other past, present, and reasonably foreseeable future actions violates NEPA and its implementing regulations and is arbitrary, capricious, and an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 4: Failure to Prepare an EIS**

166.    Riverkeeper realleges and incorporates by reference all preceding paragraphs.

167.    Federal agencies are required to prepare an EIS when "substantial questions" are raised as to whether a major federal action "may" cause significant degradation of some human environmental factor. 42 U.S.C. § 4332(C).

168.    An agency's decision not to prepare an EIS must be fully informed, adequately

considered, and supported by a convincing statement of reasons why the action's effects will not be significant.

169.    In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1508.27 (1978).  Currently codified NEPA regulations identify four considerations for the agency to consider in evaluating the significance of a proposed project. Notwithstanding the newer regulations, the intensity factors set out in prior codifications remain precedential, relevant considerations.

170.    Specifically, in assessing the intensity of a project the BLM must consider: unique characteristics/ecological areas, the degree to which effects are likely to be highly controversial, the degree to which possible effects are highly uncertain; the degree to which ESA-listed species or critical habitat will be adversely affected; whether potentially insignificant individual effects are potentially significant at a cumulative level; and whether an action threatens a violation of an environmental protection law, among others. *See* 40 C.F.R § 1508.27(b) (1978).[4]

171.    The agency's statement of reasons must show that none of the intensity factors are present. The significance of one individual factor, or of multiple non-significant factors in combination, may require preparation of an EIS.

172.    The Big League Project implicates numerous intensity factors that individually and cumulatively compel the preparation of an EIS. The BLM therefore acted arbitrarily and capriciously in issuing a FONSI and failing to prepare an EIS.

173.    First, the Big League Project will affect areas with unique characteristics, including

---

[4] *See supra* Footnote 1 regarding updates to NEPA's implementing regulations.

mature and old-growth forests that provide habitat for ESA-listed species and other special-status wildlife species, late-successional reserves, riparian reserves, as well as designated recreation areas.

174.    The units slated for logging under the Big League Project are among the last remaining old and mature forests and functioning forest ecosystems in the area. The Project has the potential to remove the last islands of functioning ecosystem—which renders these mature forest stands unique.

175.    Second, the BLM arbitrarily and capriciously issued its EA and FONSI despite high uncertainty and controversy regarding the effects of the Big League Project. The Big League Project will result in effects that are highly controversial and largely unexplored. The BLM failed to take a hard look at identified negative impacts to imperiled fish, sedimentation, stream flows, northern spotted owl habitat, fire regimes, and forest resiliency to climate change.

176.    The BLM specifically failed to address the issue of low streamflow, improperly dismissing consideration of science presented by Plaintiffs demonstrating that the BLM's conversion of mature forests to plantations in these watersheds could exacerbate already concerning low summer flow issues that jeopardize the Chinook salmon. Plaintiffs raised concerns related to these issues to the agency and provided scientific literature to support the relevance and applicability of these issues, but they were summarily dismissed.

177.    Furthermore, the Big League Project will result in highly uncertain effects or involve unique or unknown risks because the BLM failed to analyze and disclose baseline conditions and conduct site-specific NEPA analyses. Simply, Plaintiffs cannot be assured that dozens of resource values will be protected if there is no analysis to support that assumption by the agency. The

BLM's decision to defer site-specific analysis until a DNA inserts a tremendous amount of uncertainty into the NEPA process and circumvents public critique and review.

178.    Third, the Big League Project is likely to adversely affect ESA-listed species, namely, the northern spotted owl and Upper Willamette spring Chinook.

179.    The Project will remove and/or downgrade thousands of acres of spotted owl habitat and negatively affect nine known spotted owl sites. 11 percent of the BLM's proposed regeneration harvest will occur within spotted owl sites that have been documented to be occupied within the past ten years. The BLM did not consider this issue in detail and did not provide a convincing statement of reasons for how these impacts would not be significant.

180.    As expected, the three DNAs the BLM has issued for timber sales implementing the Big League Project make clear that reinitiation of consultation under the ESA with the National Marine Fisheries Service regarding effects on Upper Willamette River spring Chinook salmon has not and will not occur. Thus, adverse impacts on spring Chinook were not analyzed in the BLM's NEPA process approving the Big League Project.

181.    The BLM has also not explained how the Project will conform to the Northwestern RMP and its substantive standards as required by FLPMA. The BLM has not shown it can implement the Project without violating numerous substantive provisions and guidelines of the RMP.

182.    The intensity factors implicated by the Big League Project are significant individually. The intensity factors implicated by the Big League Project are also significant when considered cumulatively. The Big League EA simply does not contain adequate support for the BLM's conclusion that, despite the presence of these factors, the Project will have no significant impact.

183.    Further, facing threatened violations of FLPMA and the ESA, the BLM was required to

complete an EIS—a more searching and rigorous analysis of this Project's effects on the environment.

184.    The BLM's decision to authorize the Big League Project without first preparing an EIS violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.   Declare the BLM's issuance of the Big League Environmental Assessment, Finding of No Significant Impact, and Decision Record to be arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.   Declare that the BLM violated the National Environmental Policy Act and its implementing regulations by approving the Big League Project without preparing an EIS;

C.   Vacate and set aside the EA, FONSI, and DR for the Big League Project, and order the BLM to withdraw any decisions or contracts made pursuant to the Big League DR until such time as the BLM demonstrates that it has complied with the law;

D.   Enjoin the BLM and its contractors, assigns, and other agents from proceeding with implementing the Big League Project until such time as the BLM demonstrates that it has complied with the law;

E.   Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

F.  Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including

reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to

Justice Act or other applicable statutes; and

G.  Grant such further relief as the Court deems just, proper, and equitable.

Respectfully submitted and dated this 7th day of November, 2023.


*/s/   Lindsey Hutchison*_____
Lindsey Hutchison (OSB # 214690)

*/s/   John Persell*_____
John Persell (OSB # 084400)

*/s/   Nicholas Cady*_____
Nicholas S. Cady (OSB # 113463)

*Attorneys for Plaintiffs*